Clerk, please fill the last case of the day. 217-012, David Vernetti v. Bradley Barnett. Good afternoon. My name is Jason Nesment, counsel. I'm here on behalf of the petitioner, or plaintiff, David Vernetti. We're here because the commission reversed the decision of the arbitrator. We're quite happy with that decision of the commission. It's against the manifesto of the evidence. What we have here is an injury in which the plaintiff was working at a Verizon Wireless store. He was subject to an armed robbery. He was subject to a two-year robbery. He developed symptoms, psychological symptoms, nightmares, anxiety, and trouble sleeping. Let's get to the gist of it. Sure. The commission had a little trouble with the credibility of your client. First, he says that they only held a gun to the back of his head. He tells somebody else he was beaten severely. He turns around and says he had an automobile accident. It's overturned. Turns out it didn't happen that way. Claims he was shot when he was robbed. It turns out the police report suggests there was a drive-by shooting. So the question I have, just to put it in the vernacular, doesn't it appear as if the commission just didn't believe your client? I mean, they expressed they made that finding. He was lacking credibility, didn't they? They did. So what do we do with him? Well, let's look at the reasons that they attacked his credibility. I think some of the reasons that they used for attacking his credibility are incorrect. One reason they attacked his credibility based on his wage records from Verizon, indicating that his commissions subsequent to this incident were normal or on par with his pre-injury commissions. Let's set that aside. You can say that that was a minor and nitpicking kind of a thing. But I think one of the reasons they honed in on credibility, they found there were inconsistencies between his testimony at the arbitration hearing and other evidence presented at trial regarding his exposures to trauma. And Justice Hoffman has listed several. I mean, you're not going to say there was no inconsistencies on those things. You're not going to say there was no inconsistencies. I think there are minor inconsistencies. Minor inconsistencies? I was beaten severely compared to somebody held a gun behind my head? Well, that was one of his prior traumas. He was beaten severely. That was his trauma. Yeah. What about the prior one where he said he's in this automobile accident and it turns out it was a one-car collision, nobody else was involved, they hit a pole or something? And what about the drive-by shooting? Did he contend he was robbed? Sure, with each of them. The drive-by shooting occurred approximately in 1998, about 15 years prior to that. Excuse me, you're not going to tell me he forgot how it actually happened, are you? No, I'll get to it. We'll buy it. Okay. For all the record, it actually looks like each description he's had of that incident are pieces of bullet-like magic. Nobody's ever asked for a very detailed description of what happened in that incident because it wasn't relevant to this case. In one report, he mentioned that he was in a car with a drive-by. He was delivering pizza. In another report, he says it was an argument between people. He was an innocent bystander in spite. In another, he mentions that it's a drive-by. If you look at Dr. Matuta's report, it's the most complete description of that incident. He said he was in a car and there was an argument between two parties that he got caught in between them, in between. So it's more, instead of inconsistencies, it's probably each of those pieces of information are parts of the complete story of what happened. All right. So setting aside the inconsistencies, and I know you're... The next thing. The next thing is he goes to Rosecrans, okay, on July 10, 2013. And the commission cited this, the long gaps in Clayton's treatment for the alleged mental trauma. He goes to Rosecrans. At that time, he gives a detailed history of alcohol and drug abuse. He acknowledges all of the other issues, and he never mentions the March 2013 robbery at all. Okay. First of all... So how do we explain that? He forgot about this being beat severely on the head a few months earlier? No. On that July 10th, he didn't go to Rosecrans. That was a phone call to Rosecrans. Okay. Well, the phone call to Rosecrans, they say he never said anything about this robbery. And he may not have. He's dealing with post-traumatic stress disorder. One of the symptoms of that condition is avoidance. He's dealing at that point with the drug and the alcohol problem that he's developed subsequent to this injury. So it's perfectly understandable that at that point in time, his main issue is the fact that he is using both drugs and alcohol to an excess that he needs treatment for that. He may not be thinking of the cause of why he's having these problems. He's dealing with the issue at hand, which is the alcohol and drug use that has become unbearable. And he is seen by a person eight or nine days later, which he very in detail gives a description of that robbery, describes his symptoms and how he turned to drugs and alcohol because of that incident. I'll give you credit for staying there and not flinching. So let's get on to the next level of issues here. How about Dr. Hartman, which the commission cited with in their decision, Hartman found that the defendant basically exaggerated and distorted his symptoms. And Dr. Hartman attributed the claimant's psychological profile to bipolar disorder, alcohol dependence, polysubstance dependent, antisocial personality disorder. And he noted that he had all of these conditions and that basically he was incredible. So how does the commission, the commission found Hartman to be a reliable expert and they hung their hat on that partially in addition to total lack of credibility. So how do you get around Hartman's opinion? Hartman, as you're aware, is a doctor hired by the insurance company to do a report. And he did. Hartman attempts to use objective testing to determine his psychological condition. Well, that's a good start for him to do that. Well, it started if that's how psychological treatment is diagnosed and treated. Unfortunately, there's not an expert to show that you have depression or bipolar disorder. No, but he did attempt at least to. And don't doctors commonly in the psychological community use diagnostic testing to aid their decision making? They do. And they also listen to the person. They go through their symptoms and their description of their symptoms and they assess credibility that way. Dr. Hartman is the only person that has seen a scientist who has indicated there's an epilepsy. No one else that had seen him ever indicated that they had any indication that he was exaggerating or magnifying his symptoms. Come on, he's magnified. They've got him magnifying his events of trauma to a point where, I mean, it just. And they find him significantly not credible, I think was their phrase. And they listed their reasons why. So now Hartman turns around and says no connection between his condition and the robbery. And Tudor evidently says there was. And the commission decides with Hartman and lists one of the reasons. They simply don't believe your client. Sure. Hartman is noting in his report, in his opinion, that his pre-accident conditions completely overshadow any effect of his injury. The problem is there's no evidence that at the time of this injury his pre-accident conditions were affecting him. Records were provided prior to this injury. There's no indication he was under any psychological treatment at that time. He had been working. The last trauma occurred six or seven years ago. From his testimony, from the rest of the records, there's no indication he was under active treatment. I hate to cut to the chase now, and I think you've done a good job of bobbing and weaving on some of these questions. But you are now with the manifested opposite conclusion to that of the commission, as you know, must be clearly apparent. You have Dr. Hartman with his test and his examination finding that there is no support and there is no causal connection. You have the commission then finding that your client lacks credibility. And so an opposite conclusion is clearly apparent based on that? Yes. Because you've explained the way the inconsistencies doesn't amount to being an affirmative opposite conclusion is clearly apparent. Sure. It's the thing that I'm struggling with. If it was standard for him to think his problems, that this incident was the sole cause of his psychological problems, I probably wouldn't make any arguments. But the wonderful part is that this injury was a cause of his problems. So whether or not his family had, you know, predisposed him to bipolar disorder, whether or not he had trauma that occurred 15 and 7 years prior, he was doing well. He had no evidence of any symptoms of anxiety, depression, PTSD for 6 or 7 years prior to this. But there's a long history of substance abuse and alcoholism. Which Dr. Hartman said that was the cause of his condition, not the accident. Well, his testimony was that he had occasional substance use. He was able to work without a problem after this injury. Unfortunately, yes, he did increase those things. And they made it difficult, I'm sure, to determine whether or not. But what do we do with the credibility? We have something here. In many instances, as you know, and we say this occasionally, we have to sort of extrapolate and interpret by implication the commission found the claimant not credible. Here they expressly found him not credible. Well, they had to. But we don't get involved in credibility determinations, do we? No, unfortunately. We don't. It's been one of the most well-settled rules that we deal with here. We don't substitute our judgment for that of the commission on credibility. And you're asking us to do that here? Well, I'm asking you to look at the facts that they reported as using to assess that credibility. And unfortunately, I think that the facts that they're looking at to assess that credibility are incorrect. They're misinterpreting those facts. They're finding or making inferences regarding those facts that are not there. If you look at it, unfortunately, the arbitrator's credibility assessment is, I understand, not considered, which begs the question why arbitrators write decisions at all. But the arbitrator made a very specific credibility assessment. Did the commission reject it? They did, unfortunately. And you're stuck with the commission's decision. I wish the commission had the ability to observe testimony instead of just reading words. I mean, when the charge was made in the credibility assessment, they don't perceive the person or hear him. And in this case, some of those inconsistencies, as he has pointed out, weren't necessarily that close. Well, I disagree. I think there's some inferences that are drawn that shouldn't have been drawn, based on the totality of the records. Thank you. Thank you, counsel. We have time to reply. Thanks. Counsel, you may respond. May it please the Court? Thank you, Justices. Brian Kujewski, representing the appellee. Hopefully I was one of the ones that- Yours is somewhat legible. All right. It's a little better. I can live with that. As you're aware, we're dealing with a mental disability case. Your focus in the argument was on credibility and the medical experts, two things that are difficult to overcome when we're dealing with a manifest weight standard of review, which we are. I was hoping maybe tonight we could just focus on some of the arguments that were made. When some of the comments were made, Justice Hoffman, you had asked about the degree to which there was inconsistency. I would point that the more you see these mental disability cases, the more it will be important, as the medicine evolves and the testing evolves, how people say they are having problems, whether it's a flashback or actual PTSD, nightmare of sorts. It is important to rely on how the testing is done because people can say things they think give them what they want. And the best example I can give you in terms of inconsistencies was the- This is the expert that they would have hired, and it wouldn't have been that long before the trial. So this is something that he's reporting to his expert. It happened one way about it being getting caught in between some individuals. If I had yet a trial, he presented himself confidently. I laughed it off. These aren't mistakes of memory. And, in fact, that was one of the things that was tested by Dr. Hartman. He provided nearly 10 pages of what he attempted to do with objective testing, and some of these comparisons really went well beyond what I could understand, but at least one of them dealt with how does it compare to other people with true memory loss. And it was all over across the board. Another example that he would have done, for example, would have been in comparison to the person not realizing that they are being asked questions to prove they have PTSD. And so they actually go in trying to say, in essence, yes, I have these things, yes, I have these things, when nobody else reasonably would have said all of the things that he said. And even if it wasn't just the credibility, even if it was just, okay, look at the science, we do have Dr. Hartman pointing out that after he does this testing, the quote was that there was no credible additive or aggravating diagnosis of post-traumatic stress disorder related to the problem in question, and the pre-accident conditions completely overshadow any hypothetical clinical influence of the March 15, 2013 incident and render such influence speculative. That's on page 248 of the record. And counsel had commented that there wasn't a long history, but even their own expert made that comment. So on page 226 of the record, Dr. Hartman had pulled out a quote from Dr. Tudor's examination of Mr. Bernetti that pointed out that he has a long history of substance abuse. There was a personal and family history of not even just substance abuse, but mental health issues. Some of the other issues that at least would like to point out to support affirming the commission decision was a few factual timeline issues. We have someone who would have gone back to work. And after being a given week off, he actually worked up until paternity leave. And it really wasn't until this trial that there was any testimony or evidence or documentation that when he took time off eventually five months after he returned to work, that it was for anything other than child care. There were certain attempts to argue that he needed off time for the substance abuse issues, but he wasn't actively treating. And that wasn't anything that was discussed with Verizon when they asked, why do you need time off work? Child care. That was the only reason given. And that was the only reason that his appointment was separated. I think the evidence is fairly clear, but let me ask you this for identification. It appears that the commission, after finding, reversing the decision of the arbitrator on causal connection, finds all the other issues removed. They take the arbitrator's award to TPD, prospective medal, et cetera, et cetera, and then they remand it back to the arbitrator for further proceedings. What was it remanded back for? I wasn't sure how or if I would address this with the court. I certainly didn't touch it in the briefs. Right. So what do you make of that? The only initial aspect of that, perhaps, other than just cutting and pasting, it would be there an initial period of time that the arbitrator or commission could say, perhaps there's some causal connection to some temporary issue. But in all honesty, I could not think of what that argument would be that could be established under the workers' compensation act. It seems to me the remand seems inconsistent with what they were under before that. I agree. I agree. Without explanation, I would be speculating. There is nothing in the facts, certainly, that would argue that the TPD was owed prior to when it was awarded initially by the arbitrator and reversed by the commission. And the commission may know an indication of any evidence that they felt would support TPD prior to that, that they reversed from the arbitrator. Are two in the dark two apparently? No. Okay. The final point that I have, other than what has been addressed, was the eventually he was, he did seek treatment at the Department of Veterans Affairs or through their system. This was 18 months after the incident. This was the first time that a specific mental health treatment was sought. And when something that, although they were certainly brought in to testify, I think we can recognize that PTSD is not a concept for the Department of Veterans Affairs hospital system to deal with. And they directly connected it to something that happened prior to this incident, where a trauma didn't happen, a decapitation of a friend in a car in an accident. And so even when there was a direct connection drawn by someone who wasn't an expert, didn't have anything in the game, it was drawn to something prior to this accident and not connected to it. For these reasons, I would ask that you affirm the commission decision and the circuit court's affirmation of that. Thank you, counsel. Counsel, you may reply. Just briefly, regarding Dr. Hartley's opinion, his findings and memory, at the time that the plaintiff saw Dr. Hartley, it had been over a year since his injury. He had had a handful of visits with anyone regarding his condition. He had been seeking treatment, he hadn't gotten it. I wouldn't be surprised if at that point he's getting answers that he thinks are supporting what would have to be heard in order for him to get treatment. It's a year without treatment after he's been robbed at gunpoint. He needs treatment. So it's not unreasonable that he's saying something that he thinks the doctor wants to hear. Regarding his visit with the VA, he's seen on November 3rd of 2014 and gives a detailed history of what happened, that he's doing well for six to seven years following that motor vehicle accident and describes the incident with the robbery that caused these symptoms to recur, that caused these symptoms to present themselves and which resulted in his drug and alcohol abuse for several months, unfortunately. I think, in summation, this man clearly was robbed at gunpoint. There's no dispute that this happened. The commission is fine in that he's not drugged, I understand, but he clearly had an injury. There's enough evidence there that he was doing well for six or seven years before this, despite past trauma, and clearly after this, something changed in his condition psychologically. Thank you. Thank you, counsel. Thank you, counsel, both for your arguments. It will be taken under advisement that this position be issued. We will stand at recess until 9 a.m. tomorrow morning.